UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SUZANNE MICHELE LESNIEWSKI,    :
                               :CIVIL ACTION NO. 3:16-CV-1093
          Plaintiff,           :
                               :(JUDGE CONABOY)
          v.                   :
                               :
NANCY A. BERRYHILL ,           :
Acting Commissioner of         :
Social Security,               :
                               :
          Defendant.           :
                               :

---

## MEMORANDUM

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. (Doc. 1.)  Plaintiff originally identified July 16, 2007, as the disability onset date but later amended the onset date to September 23, 2010.  (R. 14.)  The Administrative Law Judge ("ALJ") who evaluated the claim, William A. Kurlander, concluded in his January 14, 2015, Decision that Plaintiff was insured through December 31, 2012, and her multiple severe impairments did not alone or in combination meet or equal the listings.  (R. 16-19.)  He also found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work with certain nonexertional limitations and that, although she was unable to do past relevant work, she was capable of performing jobs that existed in significant numbers in the national economy.  (R. 19-26.)  ALJ Kurlander therefore found Plaintiff was not disabled from September 23, 2010, through December 31, 2012.  (R. 26.)

Plaintiff filed her Complaint in this Court on June 6, 2016. (Doc. 1.)  In her supporting brief, Plaintiff asserts she should be awarded benefits or the matter should be remanded based on the following claimed errors by the ALJ: 1) he failed to consult a medical expert; 2) he failed to give appropriate weight to the opinions of Dr. Justin Eldridge; 3) he failed to give appropriate weight to GAF scores; 4) he failed to give appropriate weight to the opinion of Ms. Linda Ashley, FNP; 5) he failed to include all limitations established by the treating medical source opinions when developing his RFC; and 6) he failed to give appropriate weight to Plaintiff's complaints of disabling pain.  (Doc. 13 at 3-4.)  After careful review of the record and the parties' filings, the Court concludes this appeal is properly denied.

## I. Background

### A.   *Procedural Background*

Plaintiff protectively applied for DIB on June 20, 2012, and the claim was initially denied on January 30, 2013, and upon reconsideration on May 10, 2013.  (R. 14.)  Plaintiff filed a written request for a hearing on July 2, 2013.  (*Id.*)  ALJ Kurlander held a video hearing on November 19, 2014, with Plaintiff in New Castle, Delaware, and the ALJ in Dover, Delaware.  (R. 14.) Tony Melanson, a Vocational Expert ("VE"), and Jennifer Hinchey, attorney for Plaintiff, also appeared.  (R. 37.)

Following ALJ Kurlander's January 14, 2015, unfavorable

2

Decision, Plaintiff filed a request for review dated April 7, 2015. (R. 6-8.)  With the Appeals Council's denial of the request on April 5, 2016, the ALJ's Decision became that of the Acting Commissioner.  (R. 1-5.)

Plaintiff filed this action on June 8, 2016.  (Doc. 1.)  On August 11, 2016, Defendant filed her Answer and the administrative transcript.  (Docs. 9, 10.)  After Plaintiff filed her supporting brief (Doc. 13) on November 28, 2016, Defendant timely filed her opposing brief (Doc. 14) on January 3, 2017.  Plaintiff did not file a reply brief and the time for doing so has passed. Therefore, this matter is ripe for disposition.

**B.    *Factual Background***

Plaintiff was born on January 8, 1965, and was forty-seven years old on the date last insured.  (R. 25.)  Plaintiff reported that she graduated from high school, and she has a practical nursing degree and a year of college business classes.  (R. 647.) She has past relevant work as a program operations assistant.  (R. 25.)

The medical records are extensive, running over 1,700 pages, though not all are relevant to the time period at issue.  (R. 291-2011.)  Given the voluminous record and the parties' targeted arguments, for the sake of context the Court will highlight some relevant evidence here and further reference the record as needed in the discussion of arguments presented.  As noted above, the

relevant time period begins on June 20, 2010, and ends on December 31, 2012. (*See* R. 26.)

Plaintiff reported a history of three remote motor vehicle accidents, the last in 1992. (R. 20 (citations omitted).) David Lannik, M.D., referred Plaintiff for a neurology consultation, and Plaintiff was evaluated by Eric Goldberg, M.D., of Tidewater Neurologists, Inc., on September 23, 2010. (R. 304.) Plaintiff complained of bilateral lower extremity intermittent numbness and tingling as well as numbness and tingling in the cervical spine region, but she denied low back pain. (*Id.*) Dr. Goldberg's neurological examination included the following findings: Plaintiff was awake, alert, oriented to person, place and time; "mini-mental status exam" was within normal limits; motor exam was 5/5 bilaterally in the upper and lower extremities; normal tone and bulk; normal muscle mass; reflexes 2+ bilaterally upper and lower extremities; normal sensory exam; normal coordination; and normal gait. (*Id.*) Dr. Goldberg noted that Plaintiff had a cervical radiculopathy and possible lumbosacral radiculopathy. (*Id.*) He planned to review a cervical spine MRI and conduct an EMG/nerve conduction study of the right lower extremity. (*Id.*) Dr. Goldberg conducted an EMG study on October 4, 2010, and recorded the following conclusions: "no electrophysiologic evidence of a peripheral or entrapment neuropathy or cervical lumbosacral radiculopathy; and normal EMG and nerve conduction study of the

4

right upper and lower extremities (noting that the EMG and nerve conduction study may miss a mild cervical lumbosacral radiculopathy).” (R. 307.)  Having reviewed a previous study which showed multilevel spinal stenosis and degenerative disease at C3-C4, C4-C5, C5-C6 levels, Dr. Goldberg planned to treat Plaintiff conservatively with physical therapy and do an MRI of the cervical spine. (*Id.*)

On March 13, 2011, Plaintiff presented to CNY Family Care. (R. 464.)  Office notes indicate that Plaintiff was taking Ativan for anxiety, she reported she was still having panic attacks and depression but not as often, and she complained of bilateral knee pain which was worse at the end of the day and had increased in the preceding three weeks. (*Id.*)  Physical examination showed that Plaintiff had full range of motion of the cervical spine with pain, upper extremity strength 5/5 bilaterally, sensation intact to light touch, deep tendon reflexes 2+ bilaterally, and knees extended to 0 degrees with crepitus and flexed to 90 degrees. (R. 465.)  X-rays showed some arthritis in both knees, Plaintiff was advised to take Mobic as directed, and the provider discussed the option of cortisone injections in the future if the pain persisted. (*Id.*)  Regarding cervicalgia, Plaintiff was advised that she would be contacted to schedule an MRI. (R. 466.)

A March 25, 2011, MRI showed that Plaintiff had disc herniation at C5-C6 which slightly compressed the spinal cord,

5

moderate degenerative foraminal stenosis on the left C5-C6 for which surgical referral was recommended, mild degenerative foraminal stenosis at C4-C5 on the right and mild to moderate on the left, and a horizontal cleft in the C7 vertebral body without surrounding edema which suggested an anatomic variation. (R. 458.)

In April 2011, Plaintiff was seen by Christopher Watts, PA, of Upstate Orthopedics. (R. 396-99.) The Attending Physician is identified as William Lavelle, M.D. (R. 399.) Examination showed that Plaintiff's neck was supple with significant tenderness in the mid-low cervical spine around the C6-C7 area in the midline and paravertebral tenderness upon palpation; she had no significant tenderness along the thoracic or lumbar spinous process upon palpation; she appeared balanced and had 5/5 motor strength throughout; and deep tendon reflexes were 2+ throughout. (R. 397.) Mr. Watts assessed cervicalgia and spinal stenosis. (R. 398.) He noted that he found no indication of radicular symptoms going down the arms although her neck pain could be a degree of radicular pain into the posterior shoulders. (*Id.*) Mr. Watts explained that he does not generally manage axial neck or back pain with narcotic medication and he would continue conservative management, including over-the-counter Tylenol and Lyrica. (*Id.*) He also opined that Plaintiff would benefit from physical therapy and she agreed to this. (*Id.*) In a letter to Plaintiff's primary care physician, Mr. Watts noted that, despite significant neck pain, Plaintiff did

6

not demonstrate radicular or myelopathic symptoms, occasional tingling in the fingertips could be intermittent irritation of the nerves but the numbness was self-limiting and not chronic, her MRI demonstrated some central stenosis with slight effacement of the spinal cord but no spinal cord signal indicating myelopathy, "[m]ost importantly" she would benefit from physical therapy, and he would not recommend surgery.  (R. 394.)  He added that if conservative treatment failed, he would refer Plaintiff to physical medicine and rehab at his office and if her condition worsened, he would have her see Dr. Lavelle.  (*Id.*)

At her June 2011 follow up appointment with Mr. Watts, office records indicate that Plaintiff was doing very well overall.  (R. 398.)

> She states that the therapy helped her
> significantly.  She can tell a big
> difference, that she can now reach above her
> head and put dishes away on the shelf, which
> she states she could not do before. . . . She
> still gets some neck pain and some pain up
> into the occipital region.  She denies any
> weakness in the extremities.  No imbalance in
> her gait and no dexterity issues.

(*Id.*)

As noted by ALJ Kurlander, during Plaintiff's care at CNY Family Care through October 2011, the records show "clinical findings of decreased range of motion and pain on palpation in the claimant's neck and tightness and spasm in the claimant's shoulders that were present on some examinations but not all the time.

7

Neurological examinations were within normal limits (Exhibit 8F)."
(R. 20.)   Examples of varying examination findings are found in
Plaintiff's August and September 2011 visits: in August, physical
examination showed that Plaintiff's neck was supple, palpation
revealed no tenderness, and she had full range of motion
bilaterally in her upper and lower extremities (R. 431); in
September, the provider noted that Plaintiff had "poor posture,
slouching with neck forward," limited range of motion in the head
and neck, and flex and extension were tight (R. 428).

After Plaintiff moved from upstate New York, Justin Eldridge,
M.D., became Plaintiff's primary care provider in December 2011.
(R. 590.)   In the Social History section of the initial visit
office notes, "Current Work" status indicated that Plaintiff was
unemployed and looking for work as a receptionist.   (R. 591.)
Review of Systems indicated that Plaintiff reported fatigue, back
pain, joint pain, muscle pain, headaches, anxiety, depression, and
panic attacks.   (R. 591.)   Examination showed that Plaintiff's neck
was "tender (lower cervical vertebrae, trapezius muscles, fair ROM
of neck) and supple," and the exam was otherwise normal, including
5/5 muscle strength in upper and lower extremities.   (R. 591-92.)
Dr. Eldridge planned to adjust Plaintiff's medications to address
her herniated cervical disc and refer her to a psychiatrist to
address her mental health issues.   (R. 592.)

On January 9, 2012, Dr. Eldridge noted that Plaintiff

8

presented with back pain, headaches and "pain everywhere."  (R. 584.) In the Social History section of office notes, "Current Work" status indicates that Plaintiff was unemployed and looking for work.  (R. 585.)  She had similar complaints in February including back pain and joint pain, and morning stiffness.  (R. 578.) Plaintiff had seen a psychiatrist who had made some medication changes and she was scheduled to see a pain specialist, Dr. Chiang, with whom she planned to discuss epidural injections.  (*Id.*) Physical examination was normal except for the neck which was "tender (lower cervical vertebrae, trapezius muscles, fair ROM of neck, moves neck slowly, improved ROM laterally) and supple."  (R. 578-79.)  Dr. Eldrige planned for Plaintiff to see the pain specialist for her chronic pain syndrome and to check for inflammatory causes of joint pain and obtain x-rays.  (R. 580.)

In March, Plaintiff's complaints included lower back pain radiating into her buttock and down her right leg.  (R. 571.)  She said she had experienced this type of pain before but she had it for one week and previously it had lasted only for a day or two. (*Id.*)  Plaintiff also reported diffuse joint achiness and pain. (*Id.*)  In the Social History section of office notes, "Current Work" status indicates that Plaintiff was unemployed and looking for work.  (R. 572.)  Dr. Eldridge diagnosed Plaintiff's radiating back pain to be sciatica for which he prescribed prednisone and advised stretching and physical therapy, but Plaintiff did not want

9

therapy due to cost.  (R. 573.)  Dr. Eldridge noted that Plaintiff had chronic cervical pain which was "showing improvement"; given the extent of the pain, he recommended injections but Plaintiff was "very wary."  Regarding joint pain, Dr. Eldridge noted there were "no acute findings on examination" and he would continue to follow the problem.  (R. 576.)

In May and June 2012, Dr. Eldridge noted that Plaintiff's multiple-modality treatment included short-acting opioids and Plaintiff reported improved daily functioning though she still had significant pain.  (R. 560, 624.)  Physical examination showed some pain with range of motion testing of the neck and mild tenderness to palpation along the left cervical area, normal neurological findings, pain in the lumbosacral spine assessed to be mild, and negative straight leg raising test.  (R. 561-62.)  Assessment included that cervical pain was stable with current medications, chronic pain syndrome improved with narcotic  medication, and, as of June 5, 2012, it was noted that Plaintiff was doing well and reporting improved functioning with medications.  (R. 624.)  In the Social History section of office notes on May 11th and June 5th, "Current Work" status indicates that Plaintiff was unemployed and looking for work.  (R. 556, 561.)

On June 29, 2012, Plaintiff returned to Dr. Eldridge complaining of increasing pain which Plaintiff related to stressors in her life.  (R. 633-35.)  Physical examination was normal except

for some pain with with neck rotation, mild tenderness to palpation along the left cervical area on trapezius muscles, and generalized abdominal tenderness.  (R. 635.)  Regarding chronic pain syndrome, Dr. Eldridge talked to Plaintiff about weaning off narcotics but she was very hesitant, apparently feeling that the increased pain was related to her mood and she "had been doing well until recent job stressors."  (R. 636.)

In August 2012, Dr. Eldridge noted in the "Chronic Pain Management Follow-up Evaluation" portion of the office notes that Plaintiff was "somewhat improved."  Plaintiff continued to have good neck range of motion of her neck with some pain and mild tenderness to palpation along the left cervical area on trapezius muscles.  (R. 631.)  She had tenderness to palpation along all major muscles.  (R. 631.)  He diagnosed chronic pain syndrome and noted Plaintiff was to do acupuncture and that a chiropractic visit and biofeedback should be considered.  (R. 632.)  Regarding fibromyalgia, Dr. Eldridge planned to consider further testing. (*Id.*)

At Plaintiff's October 2012 office visit with Dr. Eldridge, she was tearful and reported worsening back pain.  (R. 672.) Plaintiff said medication side effects included fatigue, pain in the neck and low back was exacerbated by bending, twisting and standing, and associated symptoms included depression for which she was being treated by a psychiatrist, but did not include numbness,

11

tingling, paresthesias or weakness.  (R. 672.)  Plaintiff reported
functional limitations in her general activity, work, housework,
social relationships, and enjoyment of life.  (R. 672.)
Examination showed that Plaintiff again had good range of motion in
her neck but some pain with rotation and mild tenderness to
palpation along the left cervical area and trapezius muscles and
she again had tenderness to palpation along all major muscles.  (R.
674.)  Dr. Eldridge planned to get another MRI to assess the new
and worsening radiating back pain; he found the diffuse muscle
tenderness most consistent with fibromyalgia and he planned to
reintroduce Lyrica; chronic but stable cervical pain would be
treated as before; and chronic pain syndrome and increasing pain
would be assessed with MRI.  (R. 674.)

    October 17, 2012, MRI of the spine showed endplate edematous
signal at L5-S1, right L5 foraminal encroachment, and lateral
recess stenosis affecting L5 and S1 roots.  (R. 666.)  Dr. Eldridge
noted that Plaintiff had been referred to a surgeon, she may
benefit from injections for L5-S1 edema, and she was scheduled for
follow up with rheumatology.  (*Id.*)

    Plaintiff first visited rheumatologist Maged Hosny, M.D., on
October 31, 2012.  (R. 642.)  Plaintiff reported that she had been
diagnosed with fibromyalgia six months earlier and she had two
years duration of widespread arthralgia and myalgia after several
car accidents.  (R. 642.)  She also reported chronic neck and low

back pain.  (*Id.*)  Plaintiff noted that she had been referred to
pain management but no follow-up was scheduled. (*Id.*)  Neurological
and psychiatric examinations were normal.  (R. 643.)
Musculoskeletal exam showed the following: normal gait and station;
no visible swelling or effusion of upper and lower extremities;
full range of motion of the upper and lower extremities without
discomfort; tenderness detected in bilateral shoulders, elbows,
wrists, knees and ankle joints; normal muscle tone of the upper and
lower extremities; and eighteen tender points.  (*Id.*)  Examination
of the spine showed tender cervical paraspinal muscles, tender
thoracic spine, and tender bilateral SI joints.  (*Id.*)  Dr. Hosny
diagnosed herniated cervical disc without myelopathy, herniated
lumbar disc without myelopathy, and unspecified myalgia and
myositis.  (R. 644.)  He added that Plaintiff had chronic
widespread pain due to multiple factors and that she definitely had
fibromyalgia "given the daily widespread pain, the multiple tender
points all over the body"; there was evidence of multi-level
bulging discs, herniated discs of the cervical and lumbar spine
done in February 2012; and Plaintiff continued to be symptomatic
despite the use of Lyrica.  (*Id.*)  Dr. Hosny planned to increase
the Lyrica dosage and consider other medications in the future.
(*Id.*)

     At her November 26, 2012, follow-up visit with Dr. Hosny,
Plaintiff reported that she did not see an improvement with the

increase in Lyrica and had side effects of weight gain and edema of both legs.  (R. 1289.)  Physical examination findings were similar to those assessed in October.  (R. 643, 1290.)  Dr. Hosny increased the Lyrica dosage and referred Plaintiff for aquatherapy.  (R. 1290.)

On January 7, 2013, Kimberlyn R. Watson, Ph.D., conducted a mental health evaluation on referral of the disability adjudicator. (R. 646-50.)  Plaintiff reported a history of anxiety, depression, cervicalgia, osteoarthritis, herniated discs, fibromyalgia, and DVT.  (R. 646.)  When asked why she was applying for disability, Plaintiff responded:

> I have a long history of depression and anxiety.  It seems to be getting in the way of everyday activities.  Along with my anxiety comes OCD.  I can't work a schedule that is demanding.  It is too frequent that I have to stop and regroup because my mind is preoccupied with my personal life.  Nothing gets done.  I'm just stuck.

(*Id.*)  By way of background, Dr. Watson noted that Plaintiff reported "around the house she engages in regular housework such as cooking and cleaning, and states that her husband helps her out a lot.  In her spare time she reads, walks, and visits with family as much as possible who are about 3-1/2 hours away."  (R. 647.) Plaintiff also reported that she had been hospitalized three times "due to breakdowns mixed with alcohol," and the last time was in 2011, and she had been sober for two years.  (R. 648.)  In her Summary, Dr. Watson stated that Plaintiff was cooperative during

14

the interview and

> [s]he appeared to have at least average
> cognitive abilities.  Her memory for 3
> unrelated words was good.  Her social
> judgment was intact.  Her ability to engage
> in abstract thought was good.  She did not
> appear to be distracted by internal stimuli.
> She reported her anxiety and depression to be
> moderate.

(R. 649.)  Diagnostic Impressions included Generalized Anxiety Disorder, Major Depression, recurrent, and Alcoholism in Sustained Remittance, with an assessed "Current GAF" of 55.  (R. 649-50.) Dr. Watson concluded that Plaintiff's prognosis was fair.  (R. 650.)  She commented that Plaintiff had not been in treatment "for the last 2 years.  However, she may benefit from concurrent medication management and individual psychotherapy."  (*Id.*) Recommendations were that Plaintiff may benefit from 1) psychotropic medication management by a licensed mental health provider; 2) individual therapy with a therapist specializing in anxiety disorders; and 3) vocational assessment, training, and placement.  (*Id.*)

At Plaintiff's January 15, 2013, visit with Dr. Eldridge, she reported some improvement in pain.  (R. 654.)  She continued to have pain with rotation of her neck and mild tenderness to palpation of the cervical area and on trapezius muscles, and she had tenderness to palpation of all major muscles.  (R. 655.)

On January 19, 2013, Plaintiff was seen by Anjuli Desai, M.D., for a disability evaluation secondary to neck and back pain.  (R.

15

736.)  Physical examination showed Plaintiff's neck was supple and she had a non-antalgic gait, no cyanosis or edema of the extremities and palpable pulses, 5/5 strength in upper and lower extremities except for the left lower extremity which was 4+/5, 2+ deep tendon reflexes in upper and lower extremities, intact sensation, and no muscle atrophy or spasm, and no significant limitations in range of motion.  (R. 737-38.)  His functional assessment was that Plaintiff could stand, walk, and sit without limitations in an eight-hour day; she could lift and carry without limitations; she could reach, handle, feel, grasp, and finger without limitations; and Plaintiff did not have any visual or communicative limitations.  (R. 738.)

## 2.   **Opinion Evidence**

Plaintiff focuses on the opinions of Dr. Eldrige and Ms. Ashley in claiming that the ALJ did not properly assess the opinion evidence. (Doc. 13 at 6-7, 9-10.)  The Court will do the same.

*a.   Eldridge Opinion*

On October 17, 2014, Dr. Eldridge signed a "Work/School Excuse" addressed "To whom it may concern." (R. 2006.)  He first noted that Plaintiff had been a patient at Westside Family Healthcare since December 19, 2011.  (*Id.*)  He then provided the following opinion:

> In brief, the patient has multiple medical problems, with the main issue being her chronic pain.  The patient has had motor vehicle accidents x 3 in past, which has

16

> resulted in herniated cervical disc and
> chronic cervical pain.  She has seen pain
> management in past for injections with
> minimal success.  In addition, the patient
> has fibromyalgia, for which she was diagnosed
> by a rheumatologist and with whom she
> continues to see and receive treatment.  In
> early 2013, the patient was diagnosed with
> breast cancer and received chemotherapy,
> radiation, and eventually, a bilateral
> mastectomy.  Her cancer treatment has been
> complicated by painful peripheral neuropathy
> due to chemotherapy she had received, and
> most recently, lymphedema of her R upper
> extremity.  She also has a history of
> depression and anxiety, for which she is
> followed by a psychiatrist.

(R. 2006.)

b.  *Ashley Opinion*

Linda Ashley, FNP, of the Rheumatology Center completed a

Fibromyalgia Medical Source Statement on November 13, 2014.  (R.

2007-2011.)  Ms. Ashley said Plaintiff had ongoing contact with

Plaintiff since October 31, 2012, and, in addition to fibromyalgia,

Plaintiff had chronic neck and low back pain with the following

symptoms: multiple tender points; nonrestorative sleep; chronic

fatigue; morning stiffness; muscle weakness; subjective swelling;

frequent, severe headaches; numbness and tingling; anxiety; panic

attacks; depression; and chronic fatigue syndrome.  (R. 2007.)  Ms.

Ashley stated that Plaintiff had daily, widespread, dull, aching

pain and the side-effects of her medication were drowsiness,

dizziness, and GI upset.  (R. 2008.)  In a competitive work

situation, Ms. Ashley opined that Plaintiff could walk for less

17

than one block; she could sit for twenty to thirty minutes and stand for ten to fifteen minutes at a time before she would need to get up; in an eight-hour day she could sit or stand for a total of less than two hours; she would need a job that permitted a sit/stand option at will; she needed to walk every fifteen to twenty minutes for ten minutes; and she would need to take unscheduled breaks every thirty minutes for fifteen minutes; her legs would need to be elevated above heart level thirty percent of the workday; she could rarely lift less than ten pounds and never more than that; she could occasionally twist, stoop and climb stairs and never crouch or climb ladders; and she could rarely look down and occasionally turn her head right or left, look up, or hold her head in a static position.  (R. 2009-2010.)  Ms. Ashley also assessed handling, fingering and reaching limitations ranging from zero to twenty-five percent of an eight-hour day.  (R. 2010.) Regarding work stress, Ms. Ashley opined that Plaintiff was incapable of even low stress work.  (R. 2011.)  She also stated that the symptoms and limitations identified began in 2010.  (*Id.*)

3.   **Hearing Testimony**

At the November 19, 2014, hearing, Plaintiff testified that she last worked in July of 2007.  (R. 46.)  She said she left her job at Employment Opportunity and Training because she was hospitalized for mental health issues, some of which were related to alcohol abuse, and when she went to her employer to discuss her

absence, she was told she was no longer needed.  (R. 46-47.)  When asked about alcohol use, Plaintiff said she last drank on April 11, 2014, and had been sober for three years before that.  (R. 47.) She described the April 2014 incident as "a hiccup" and  explained that she drank rubbing alcohol and was taken to the hospital by ambulance but was not admitted.  (*Id.*)

The ALJ asked Plaintiff's attorney why the alleged onset date had been amended from July 2007 to September 2010 and the attorney indicated the date corresponded with Plaintiff's visit to Tidewater Neurology.  (R. 49.)

Plaintiff testified that she believed she was unable to work full-time during the relevant time period, from September 23, 2010, to January 1, 2013, because of fibromyalgia pain and OCD.  (R. 53-54.)  She commented "I just didn't believe that I was employable, because, you know, I just couldn't concentrate on any one project, and I felt that, you know, coupled with the pain that I had with the fibromyalgia, I, I just didn't, didn't believe I was employable."  (R. 54-55.)

## 4.  **ALJ Decision**

In his January 14, 2015, Decision, ALJ Kurlander set out the following Findings of Fact and Conclusions of Law:

> 1.  The claimant last met the insured status requirements of the Social Security Act on December 31, 2012.
>
> 2.  The claimant did not engage in substantial gainful activity during the

adjudicatory period from her alleged onset date of September 23, 2010 through her date last insured of December 31, 2012 (20 CFR 404.1571 et seq.).

3.   Through the date last insured, the claimant had the following severe impairments: Fibromyalgia; back disorder, neck disorder; knee disorder; status post remote motor vehicle accidents; myalgia and myositis; chronic pain syndrome; obesity; DVT with IVC filter/acute venous embolism and thrombosis/history of heparin-induced thrombocytopenia with greenfield filter; anemia; obesity; mood disorder; history of anxiety and depression; and alcohol use disorder (20 CFR 404.1520(c)).

4.   Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a), except that she could perform unskilled work, with no exposure to intoxicants, such as pharmaceuticals or alcohol; no more than occasional exposure to atmospheric irritants, such as dust, fumes, odors, or gases; no more than occasional postural activities, but no climbing, no more than occasional use of ramps and stairs, and no use of ladders, ropes, or scaffolds; no exposure to moving machinery or work at exposed heights; and no more than frequent fingering bilaterally.

6.   Through the date last insured, the claimant was unable to perform any past

relevant work (20 CFR 404.1565).

7.  The claimant was born on January 8, 1965 and was 47 years old, which is defined as a younger individual age 45-49, on the date last insured (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.  The claimant was not under a disability, as defined in the Social Security Act, at any time from September 23, 2010, the alleged onset date, through December 31, 2012, the date last insured (20 CFR 404.1520(g)).

(R. 16-26.)

Other relevant portions of the Decision will be discussed in the Discussion section of this Memorandum.

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to

21

determine whether a claimant is disabled.[1]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional

---

[1]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs which existed in significant numbers in the national economy.  (R. 25-26.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third

Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result

24

but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Comm'f of Soc. Sec.*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .")). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary,

in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *Albury v. Comm'r of Soc. Sec.*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."); *see also Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) (a remand is not required where it would not affect the outcome of the case.).  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

Plaintiff asserts she should be awarded benefits or the matter should be remanded based on the following claimed errors by the ALJ: 1) he failed to consult a medical expert; 2) he failed to give appropriate weight to the opinions of Dr. Justin Eldridge; 3) he failed to give appropriate weight to GAF scores; 4) he failed to give appropriate weight to the opinion of Ms. Linda Ashley, FNP; 5) he failed to include all limitations established by the treating medical source opinions when developing his RFC; and 6) he failed

to give appropriate weight to Plaintiff's complaints of disabling pain.  (Doc. 13 at 3-4.)

### A. Medical Expert Consultation

Plaintiff first argues that ALJ Kurlander erred because he did not have a medical expert at the hearing and he could not, of his own accord, determine that Plaintiff did not have an impairment or combination of impairments that meets or medically equals a listing.  (Doc. 13 at 5 (citing HALLEX I-2-6-70; SSR 83-20).) Defendant responds that Defendant's argument is without merit: "Pursuant to SSR 83-20, an ALJ is not required to seek medical expert testimony concerning a disability onset date in cases where the ALJ does not make a finding of disability."  (Doc. 14 at 13 (citing SSR 83-20, 1983 WL 31249 (S.S.A.); *Zirnsak v. Colvin*, 777 F.3d 607, 613 (3d Cir. 2014); *Allen v. Colvin*, Civ. No. 11-00609, 2013 WL 1310840 (S.D.W. Va. Mar. 28, 2013); *Hill v. Astrue*, Civ. No. 10-008, 2011 WL 1207232, at *12 (E.D. Va. Feb. 7, 2011)).)  The Court concludes Plaintiff has not shown error on the basis alleged.

Plaintiff's largely conclusory argument is neither clearly drafted nor well-supported.  (*See* Doc. 13 at 5-6.)  The cited Social Security Ruling addresses the "Onset of Disability" with introductory language which clearly indicates that the onset date is to be determined separately from the disability determination itself.  SSR 83-20, 1983 WL 31249, at *1.  Certainly there is no onset date question here because the ALJ determined that Plaintiff

was not disabled during the relevant time period.  Therefore, the cited Social Security Ruling does not support the claimed error. Similarly, HALLEX I-2-6-70, "Testimony of a Medical Expert," offers no support for Plaintiff's claimed error in that it addresses pre-hearing and hearing conduct "[w]hen an . . . ALJ determines that a medical expert is needed at a hearing,"--it does not address the basis upon which the determination is to be made.

**B.    *Eldrige Opinion***

Plaintiff next argues that the ALJ erred as a matter of law when he failed to give appropriate weight to the opinion of Dr. Eldridge, Plaintiff's treating physician since December 19, 2011. (Doc. 13 at 6.)  Defendant responds that ALJ Kurlander complied with the regulations when considering the opinion.  (Doc. 14 at 14.)  The Court concludes Plaintiff has not shown the ALJ erred on the basis alleged.

Plaintiff again presents the claim of error in a conclusory fashion and essentially contends that the opinion of Dr. Eldridge should have been given controlling weight, citing relevant regulations and Social Security Rulings but not correlating fact and law beyond asserting the length of time Dr. Eldridge treated Plaintiff.  (Doc. 13 at 6-7.)  Thus, Plaintiff has not presented a reasoned argument as to why the ALJ erred in his consideration of Dr. Eldridge's opinion.  However, given the remedial nature of the Social Security Act, *Dobrowolsky*, 606 F.2d at 406, the Court will review the ALJ's consideration of Dr. Eldridge's opinion.

28

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight. *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)). Sometimes called the "treating physician rule," the principle is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986). The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).[2] "A cardinal principle

---

[2] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-

guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); see also *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008).  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

The Court of Appeals for the Third Circuit addressed a plaintiff's argument that an ALJ failed to give controlling weight

---

supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

to the opinion of a treating physician in *Horst v. Commissioner of Social Security*, 551 F. App'x 41, 46 (3d Cir. 2014) (not precedential).

> "Under applicable regulations and the law of this Court, opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001). Controlling weight is given when a treating physician's opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2). "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence that he rejects and his reason(s) for discounting that evidence." *Fargnoli*, 247 F.3d at 43.

551 F. App'x at 46. *Horst* noted that neither the ALJ nor the court needed to rely on the treating physician's opinion that the plaintiff was completely disabled: "As an initial matter, 'the ALJ--not treating or examining physicians or State agency consultants--must make the ultimate disability and RFC determinations." 551 F. App'x at 46 n.7 (quoting *Chandler v. Comm'r of Social Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); citing 20 C.F.R. § 404.1527(d)). Although it is true that an ALJ's credibility judgments alone cannot override a treating physician's medical opinion that is supported by the evidence, *Morales v. Apfel*, 225 F.3d 310, 310 (3d Cir. 2003), where an ALJ relies "upon more than personal observations and credibility determinations in discounting the treating physician's finding of disability," the

31

ALJ does not run afoul of relevant law. *Drejka v. Commissioner of Social Security*, 61 F. App'x 778, 782 (3d Cir. 2003) (not precedential) (distinguishing *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000) (holding that an ALJ's credibility judgments alone cannot override a treating physician's medical opinion that is supported by the evidence)).

Here ALJ Kurlander set out the following analysis:

> I have considered the opinion of Dr. Eldgridge, the claimant's primary care physician, set forth in a report dated October 17, 2014 (Exhibit 39F).  A treating source opinion may be entitled to controlling weight (20 CFR 404.1527(c) and SSR 96-2p) if the opinion as to the nature and severity of the impairment(s) is well supported by acceptable clinical and laboratory techniques and is not inconsistent with the other substantial evidence of record.  Even if the treating source opinion is not entitled to controlling weight, it is not disregarded but must be evaluated using the factors identified at 20 CFR 404.1527(c)(3) through (5).  These regulations identify factors that will be considered in evaluating every medical opinion, including: examining relationship, treatment relationship, supportability with the relevant medical evidence, consistency with the record as a whole, specialization, and any other factors that tend to support or contradict the opinion.  I do not give Dr. Eldridge's opinion controlling weight and give it little weight as it relates to the period through the date last insured because it is inconsistent with other substantial evidence and is not supported by the record as a whole.  In particular, Dr. Eldrdige's opinion, to the extent that it supports a finding of disability through the date last insured, is inconsistent with unremarkable muscoloskeletal and neurological examinations reported in his own detailed, contemporaneous

office notes as well as the clinical
examination findings reported by Dr. Hosny,
Dr. Goldberg, and Dr. Desai as discussed
above.  Moreover, Dr. Eldridge's statement
was not prepared until nearly two years after
the date last insured and is given less
weight than a contemporaneous assessment.
Additionally, Dr. Eldridge includes in his
report the claimant's diagnosis of breast
cancer and subsequent complications, all of
which first occurred after the date last
insured.

(R. 23.)

Clearly ALJ Kurlander assessed Dr. Eldridge's opinion in the

proper legal context: he acknowledged the length and nature of the

treating relationship and identified other factors appropriately

considered in determining the weight to be attributed to the

opinion.  (*Id.*)  As noted above, Plaintiff does not factually

criticize the analysis.  For example, Plaintiff does not point to

evidence showing that the opinion is consistent with other

substantial evidence and supported by the record; she does not deny

that, through the date last insured, Dr. Eldgridge reported

unremarkable muscoloskeletal and neurological examinations in his

own office notes; and she does not deny that Dr. Eldridge includes

in his report the claimant's diagnosis of breast cancer and

subsequent complications which first occurred after the date last

insured.

As Defendant points out with factual specificity, the ALJ's

reasoning regarding consistency with the record is supported by the

record.  (Doc. 14 at 15-16.)  Beyond some tenderness, no weakness

33

or other problematic symptoms of Plaintiff's upper and lower extremities were revealed on physical examination during the relevant time period.[3]  (*Id.* (citations omitted).)  Although Dr. Desai found 4+/5 strength in the left lower extremity in January 2013, there was no muscle atrophy or spasm.[4]  (*Id.* at 16.) Similarly, the ALJ's consideration of the date of the opinion and the fact that it contains assessments of limitations that post-date the relevant time period (R. 23; R. 2006) are also appropriate reasons to conclude the opinion does not support disability *before* the date last insured.

Because the ALJ's assessment of Dr. Eldgridge's opinion is supported by substantial evidence, the claimed error is not cause for reversal or remand.[5]

---

[3] As reviewed in the Background section of this Memorandum, Plaintiff routinely exhibited some pain with neck rotation.

[4]  As noted by Defendant, the lack of atrophy has been found relevant to allegations of inactivity or inability to perform even sedentary work.  (Doc. 14 at 16 n.3 (citing David a Morton III, M.D., *Medical Proof of Social Security Disability* 53 (West Pub. 1983); *Dixon v. Comm'r of Soc. Sec.*, 183 F. App'x 248, 252 (3d Cir. 2006); *Hagner v. Barnhart*, 57 F. App's 981, 983 (3d Cir. 2003)).)

[5]  The conclusion that the ALJ properly determined that Dr. Eldridge's opinion for the relevant time period was entitled to little weight is bolstered by significant evidence not specifically referenced by the ALJ: 1) the opinion itself identifies symptoms of cervical pain and fibromyalgia pain but does not opine how or why the pain limits Plaintiff's ability to work (R. 2006); 2) from Plaintiff's first visit to Dr. Eldridge in December 2011 through June 2, 2012, office notes continually indicate that Plaintiff was unemployed and looking for work (*see*, *e.g.*, R. 591, 624); 3) Plaintiff told Dr. Watson in January 2013 that she was applying for disability because of anxiety and OCD and did not mention disabling pain (R. 646) and also told her she had not been in treatment for

C.    *GAF Scores*

    With Plaintiff's third claimed error, she alleges the ALJ erred because he did not include the "serious limitations" associated with a GAF score of 50 when he determined Plaintiff's RFC.  (Doc. 13 at 7-8.)  Defendant responds that the ALJ appropriately considered GAF scores contained in the record.  (Doc. 14 at 16.)  The Court concludes Plaintiff has not shown error on the basis alleged.

    As with Plaintiff's preceding claims of error, the GAF issue is presented as a series of conclusory statements.  (Doc. 13 at 7-8.)  After appropriately reviewing the relevance of GAF scores, Defendant asserts that the ALJ gave compelling reasons for discounting the GAF score of 50.  (Doc. 14 at 18.)  A review of ALJ Kurlander's decision shows this to be the case.  (*See* R. 24.) While Plaintiff points to only a GAF score of 50 (assessed two months after the onset date in connection with an alcohol related four-day hospital admission (R. 346)), the ALJ reviewed all GAF scores during the relevant time period, noting that subsequent to

---

her mental health problems for two years (R. 650.); 4) Plaintiff testified that she did not think she could work during the relevant time period because of OCD and fibromyalgia pain (R. 54-55); 5) Plaintiff had not told Dr. Eldridge that she had OCD or associated symptoms and such symptoms were not identified as problems to treating providers during the relevant time period; 6) in addition to the work status observation previously noted, Plaintiff reported improved daily functioning up until June 5, 2012, and at her June 29, 2012, appointment, Plaintiff attributed exacerbation of symptoms to recent stressors (R. 624, 633, 636), evidence which indicates a shorter duration of allegedly disabling fibromyalgia pain than Plaintiff indicated at the hearing.

the November 2010 score of 50, scores ranged from 55 to 65 which indicate no more than mild to moderate symptoms or limitations. (R. 24.)  ALJ Kurlander adequately explains his associated conclusions and, therefore, did not err in his GAF score consideration.  (R. 24.)

D.    *Rheumatology Opinion*

Plaintiff contends the ALJ erred because he failed to give appropriate weight to the opinion of Linda Ashley, her rheumatology FNP (family nurse practitioner), both because he did not properly credit symptoms and limitations found by Ms. Ashley and because he did not discuss considerations related to the opinion of a "non-acceptable medical source."  (Doc. 13 at 8-9 (citing SSR 06-3p; 20 C.F.R. § 404.1527(d) and 20 C.F.R. § 416.927(d)).)  Defendant responds that the ALJ properly considered the opinion.  (Doc. 14 at 20.)  The Court concludes Plaintiff has not shown the ALJ erred on the bases alleged.

Because Ms. Ashley is not an "acceptable medical source" as defined in the regulations, consideration of her opinion is governed by the treatment of "other sources."  20 C.F.R. § 404.1513.  The regulation provides that "other sources," including therapists, may be used to show the severity of an impairment and how it affects the claimant's ability to function.  20 C.F.R. § 404.1513(d).  Social Security Ruling 06-03p, 2006 WL 2329939 (S.S.A. Aug. 9, 2006), clarifies how opinions from sources who are not "acceptable medical sources" are considered.  *Id.* at *1.  The

ruling explains that the distinction between "acceptable medical sources" and other health care providers who are not "acceptable medical sources" is necessary for three reasons: 1) evidence from "acceptable medical sources" is necessary to establish the existence of a medically determinable impairment, *id.* at *2 (citing 20 C.F.R. § 404.1513(a) and 416.913(a)); 2) only "acceptable medical sources" can give medical opinions, *id.* (citing 20 C.F.R. § 1527(a)(2) and 417.927(a)(2)); and 3) only "acceptable medical sources" can be considered treating sources whose medical opinions may be entitled to controlling weight, *id.* (citing 20 C.F.R. § 404.1502 and 416.902).  However, "[o]pinions from these medical sources who are not technically deemed 'acceptable medical sources' . . . are important and should be evaluated on key issues such as impairment severity and functional effects."  *Id.* at *3.

The ALJ was required pursuant to regulations and rulings to weigh evidence from Ms. Ashley and he did so here.  (R. 24.)  He provided the following reasons for giving the opinion limited weight:

> Ms. Ashley indicated that the claimant's symptoms and limitations began in 2010. However, Ms. Ashley did not begin treating the claimant until October 2012, shortly before the date last insured, and the record shows that the claimant did not consult with a rheumatologist until October 2012. Therefore, this opinion is speculative and, at best, not based on first-hand knowledge. Moreover, the questionnaire is not based on contemporaneous knowledge, as it was completed nearly 2 years after the claimant's date last insured.

(R. 24.)  The date of the opinion, treating relationship, duration
of pre-date-last-insured treatment, and speculative nature of the
opinion are appropriate considerations.   Importantly, Plaintiff
does not discount any of these specific findings.  Therefore,
Plaintiff has not shown the ALJ erred in his assessment of Ms.
Ashley's opinion.[6]

## E.    Treating Source Limitations

Plaintiff's fifth claimed error is that ALJ Kurlander did not
include limitations established by treating source opinions in his
RFC assessment.  (Doc. 13 at 9.)  Defendant responds that
substantial evidence supports the ALJ's RFC.  (Doc. 14 at 21.)  The
Court concludes Plaintiff has not shown error on the basis alleged.

In support of her assertion, Plaintiff first points to the
breast cancer related nueropathy and right arm lymphadema noted by
Dr. Eldridge (R. 2006) and limitations assessed by Ms. Ashley (R.
2008-09).  (Doc. 13 at 9.)  She also points to the ALJ's step three
finding that she had two periods of decompensation and lack of a
related workplace absenteeism limitation in the RFC.  (*Id.* at 10.)

With this claimed error, Plaintiff once again ignores a key
consideration in this case--*the relevant time period ended on*

---

[6]   Though not cited by the ALJ, the Court's conclusion that
Plaintiff has not shown error is bolstered by additional
considerations.  As with the Eldridge opinion, the Ashley opinion
1) is not consistent with evidence during the relevant time period,
and 2) Plaintiff herself did not allege symptoms/limitations
similar to those found in the opinion until mid-2012 as opposed to
the 2010 onset found by Ms. Ashley.  *See supra* p. 34 n.5.

*December 31, 2012.*  (R. 26.)  ALJ Kurlander highlights this fact in
the explanation of his RFC assessment:

> <u>I do not have an opinion as to what, if any,
> functional limitations and impairments the
> claimant has now, and whether she now is
> limited to any particular exertional level.
> In this decision, I have only considered the
> impairments and limitations present during
> the adjudicatory period at issue in the
> instant claim.</u>

(R. 19 (emphasis in original).)  Given the time period at issue,
Plaintiff's reliance on limitations related to breast cancer which
occurred after the date last insured is misplaced.  Similarly,
reliance on limitations opined by Ms. Ashley is misplaced for the
reasons discussed in the Court's discussion of that opinion and
related footnote.

Regarding episodes of decompensation, Plaintiff does not
acknowledge the important distinction between a step three listing
inquiry/finding and a residual functional capacity assessment, one
explained by ALJ Kurlander in his Decision.  (*See* R. 19.)  The
broad decompensation category in "paragraph B" criteria of listings
12.04, 12.06, or 12.09 looks at whether the claimant had "repeated
episodes of decompensation, each of extended duration."  (R. 18.)
Though ALJ Kurlander concluded that Plaintiff experienced "one or
two episodes of decompensation, which have been of extended
duration during the adjudicatory period" (R. 18 (citing Exhibit 5F,
page 1 [R. 346]; Exhibit 30F, page 103 [R. 1321]), he also
concluded that Plaintiff had not had "'repeated' episodes of

39

decompensation" (*id.*).   The ALJ could have considered functional limitations associated with the one or two periods of decompensation if he concluded such limitations were established—the obligation extends only to credibly established limitations. *See Rutherford,* 399 F.3d at 554.   Plaintiff does not show how the isolated periods of decompensation cited, the first of which occurred in November 2010 and the second in January 2012, would require a worplace absenteeism limitation in the RFC.   Therefore, she has not met her burden of showing the ALJ erred on the basis alleged.

**F.   Credibility**

Plaintiff's final claimed error is that ALJ Kurlander failed to give appropriate weight to Plaintiff's complaints of disabling pain.  (Doc. 13 at 10.)   Defendant responds that the ALJ sufficiently addressed Plaintiff's pain.  (Doc. 14 at 23.)   The Court concludes Plaintiff has not shown the ALJ erred on the basis alleged.

Plaintiff relies on the opinions of Dr. Eldgridge and Ms. Ashley to support her assertion that her complaints of disabling pain "were repeatedly detailed by physicians and medical providers." (Doc. 13 at 10 (citing R. 2006, 2008).)   The problem with reliance on the opinions of these providers was discussed above and need not be repeated here.   Plaintiff's three-sentence "argument" falls far short of satisfying her burden of showing

40

error on the basis alleged.[7]

### V. Conclusion

For the reasons discussed above, the Court concludes Plaintiff's appeal of the Acting Commissioner's decision is properly denied.  An appropriate Order is filed simultaneously with this Memorandum.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: March 1, 2017

---

[7]  See notations regarding the opinions of Dr. Eldridge and Ms. Ashley citing evidence of record countering Plaintiff's allegations of disabling pain.  *See supra* p. 35 n.5, p. 39 n.6.